UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JORDAN MICHAEL DRAKE,<br><br>Defendant. | Case No. 1:19-cr-00402-DCN-1<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. INTRODUCTION

Pending before the Court are Defendant Jordan Michael Drake's Motion to Dismiss Indictment (Dkt. 27), First Motion in Limine (Dkt. 32), and Plaintiff United States of America's ("United States" or "Government") Motion in Limine to Exclude Entrapment Defense (Dkt. 30).

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

For the reasons outlined below, the Court will DENY the Motion to Dismiss; DENY the First Motion in Limine as MOOT; and DENY the Government's Motion in Limine to Exclude Entrapment Defense.

## II. BACKGROUND

### A.  Procedural Background

On November 24, 2019, Drake was charged by criminal complaint with Attempted

Coercion and Enticement of a Minor in violation of 18 U.S.C. § 2422(b). Dkt. 1. A federal

grand jury later returned a two-count Indictment against Drake. Dkt. 17. Count One of the

Indictment charged:

> On or between November 23, 2019, and November 24, 2019, in the District
> of Idaho, the defendant, JORDAN MICHAEL DRAKE, using the internet, a
> facility and means of interstate and foreign commerce, did knowingly
> attempt to persuade, induce, entice and coerce a person he believed to be a
> minor to engage in sexual activity for which any person can be charged with
> a criminal offense, to wit: Idaho Code § 18-1508, in violation of Title 18,
> United States Code, Section 2422(b).

*Id*.

> Count Two of the Indictment charged:

> On or between November 23, 2019, and November 24, 2019, in the District
> of Idaho, the defendant, JORDAN MICHAEL DRAKE, using the internet, a
> facility and means of interstate and foreign commerce, did knowingly
> attempt to initiate the transmission of the name, address, telephone number,
> social security number and electronic mail address of another individual,
> knowing that such individual had not attained the age of 16 years of age, with
> the intent to entice, encourage, offer, and solicit any person to engage in
> sexual activity for which any person can be charged with a criminal offense,
> to wit: Idaho Code § 18-1508, in violation of Title 18, United States Code,
> Section 2425.

*Id*.

The Indictment also contained a criminal forfeiture allegation pursuant to 18 U.S.C.

§ 2428.[1] On December 19, 2019, Drake entered a plea of not guilty to the Indictment. Dkt.

---

[1] On August 18, 2020, the parties stipulated to submit the issue of forfeiture to the Court, should the jury return a guilty verdict on either count in the Indictment. Dkt. 33.

MEMORANDUM DECISION AND ORDER - 2

19. After granting several motions to continue (Dkts. 22, 26, 41), the Court set a date of October 19, 2020, for trial. Dkt. 41. Before the Court granted the latest continuance on September 4, 2020, the parties filed the instant motions in anticipation of trial.

### B.  Factual Background

The Court recognizes that the following recitation of the underlying facts is sexually explicit. That said, background and context are necessary to understand the pending motions and the Court's ruling on them.

Between November 22 and November 24, 2019, law enforcement conducted an undercover online child enticement operation. As part of the operation, undercover detectives monitored advertisements posted on various internet websites and social media applications. On November 23, 2019, Drake posted an advertisement on Doublelist.com ("Doublelist"), which is an online classifieds, dating, and personals website. Doublelist describes itself as being for "the straight, gay, and curious looking to connect locally right now." Dkt. 30, at 2. In his advertisement, Drake purported to be a wife who was looking for someone to have sexual contact with her husband.[2]

The ad placed by Drake appeared as follows:

**Keep my hubby company while i'm out of town (boise)[3]**

I'm out of town for business (and maybe a little more . . . 😉for the week and my husband is all alone at home because he couldn't get off work. I feel

---

[2] Once arrested, Drake acknowledged that he was the person who posted the Doublelist ad. Dkt. 1, at 4.

[3] The Court has not altered abbreviations and grammatical and spelling mistakes in any of the communications between Drake and the UC, including those in Drake's Doublelist ad.

bad having fun without him, but maybe you can help him have a little fun without me 😉 Let me know if you'd like to give me (or, rather, him) a hand with a little something while I'm away. If he likes you, maybe we can give him a little more of something together when I get home. . . NSA[4] only, and you MUST be drug and disease free.

Dkt. 1, at 4.

Between approximately 10:44 p.m. and 11:09 p.m. on November 23, 2019, an Undercover Internet Crimes Against Children Officer ("UC") exchanged several e-mails with Drake. During this exchange, Drake posed as a fictitious wife named "Jess." The e-mail exchange was as follows:

UC:        your hubby like younger girls? Lol

JESS:      I don't think he'd have a problem with a younger girl 😉 The real

           question is HOW young. I don't really want to set him up for statutory

           rape…

UC:        hmmmm . . . im probably to young then lol

JESS:       Not necessarily… 😉 As long as you're consenting and safe I don't

           think age matters too much. Besides, he maybe doesn't need to know

           how old you are, right?

UC:        txt me 208 [number redacted]

JESS:      Just did. I'm 208 [number redacted]

---

[4] "NSA" stands for "No Strings Attached and is used in personal ads by people seeking casual sex without the necessity of having a relationship." Dkt. 30, at 3 n. 1.

Beginning at 11:06 p.m. on November 23, 2019, and ending at 2:21 a.m. on November 24, 2019, the following relevant text message exchange between Drake, posing as "Jess," and the UC occurred.[5]

JESS:        So, tell me a bit about yourself Kaylee Jo

JESS:        I love your name, btw [by the way]

JESS:        So cute!

UC:          ty [thank you] 😊

UC:          ur ad says your out of town. . . where r u?

JESS:        Visiting family outside of Seattle. My sister is having a baby in the next few days, so we're all gathered here to support her. Hubby's stuck in Boise working, though.

JESS:        He puts in, like, 80 hour weeks, so, since he couldn't come with us (and since I've already gotten to enjoy a few fun meetups with some old "friends" who live in the area), I figured this would be an exciting way to show him I'm thinking of him ;)

UC:          and you're cool with younger…?

JESS:        Besides, you know, photos of myself with other dudes ;)

JESS:        I mean, I'm chill as long as you are.

JESS:        How young are you, if you don't mind me asking?

_____

[5] The Government attached the full text message exchange between "Jess" and the UC as Exhibit 1 to its Motion in Limine. Dkt. 30-1. The Court has included the texts that are pertinent to the instant motions.

UC:        tbh [to be honest] im in high school

JESS:      That's okay

JESS:      16, 17?

UC:        15…is that cool? 😬

JESS:      Haha, wow, I definitely wouldn't tell him that

JESS:      But yeah, I'm cool

UC:        what do you think he would like?

JESS:      It's be pretty shitty of me to say otherwise, because one of the first guys I had sex with was 33 when I was 15, so…

JESS:      Like what kind of girl would he like, or what would he like sexually?

UC:        both

JESS:      I know he does have a bit of a schoolgirl fantasy, so you're kind of perfect, honestly[6]

                 . . . . . . . . . . . . . . . . . . . .

UC:        so how would we do this?

JESS:      Well, what does your schedule look like this week? Do you have time off for Thanksgiving?

UC:        my parents are out of town tonite but will be back tomorrow

JESS:      Hmmm…

---

[6] At Drake's instigation, the text exchange became increasingly graphic after this message. Dkt. 30-1. The Court has omitted exceedingly explicit portions of the text exchange but notes each sexually explicit message was sent by Drake, and not by the UC. *Id.*

MEMORANDUM DECISION AND ORDER - 6

JESS:        I think he may be working until late tonight, but I'll check with him.

JESS:        Would you want me to send him over tonight, in that case?

JESS:        Ooh! OR….

JESS:        Would you want to meet him someplace public first, just so you know he's not a serial killer?

UC:        ya i could meet him at a gas station by my house

UC:        wouldn't he think this is weird?

JESS:        Like I said, we've got a kind of open marriage thing

JESS:        But if he thinks I'm sending him out to pick something I've bought on Facebook Marketplace, which I do a lot, he probably wouldn't.

JESS:        I'm more concerned with making sure YOU don't think it's too weird. I want to make sure you feel safe.

UC:        aww ty, im good

JESS:        Good, I'm glad :)

JESS:        By the way, have you got a pic? I'm VERY curious to know what the girl who's going to fuck my husband looks like…[7]

JESS:        Ah! Girly, you are so flipping cute!

UC:        ty 😊 u think hell like me?

JESS:        Honey, he's going to LOVE you :D

---

[7] The UC responded to this message with a purported picture of "Kaylee Jo." Dkt. 30-1, at 5.

. . . . . . . . . . . . . . . . . . . .

UC:        so you still thinking tonight..?

JESS:      I think we could make it work if you want. What are you thinking?

JESS:      You could always meet him someplace like the mall and fuck in a dressing room, too…

JESS:      There are all KINDS of exciting ways to do this.

JESS:      You still there?

UC:        Sorry was talking with a friend

UC:        The mall is closed right?

JESS:      No worries.

JESS:      Yeah, it's closed but I figured if tonight didn't work for you that might be an option tomorrow or something.

JESS:      I have to admit, if you're up for it, I'm kind of excited to have it happen tonight so I can talk to him afterward…

UC:        my parents will be home tomorrow so…

UC:        does he want to?

JESS:      I can get him out the door. He'll be a little surprised, but that's not a bad thing ;)

UC:        well im still up 😊

JESS:      Well I'll send him your way ;)

JESS:      Where is that, by the way?

UC:        so hes good with it?

JESS:        He's good

JESS:        I told him I was reading an article in Cosmo and asked him what his

             opinion on age was

UC:          lol whatd he say?

JESS:        His exact words were, "As long as everyone is safe and on board, what

             does it matter? Kids have sex in high school all the time."

             . . . . . . . . . . . . . . . . . . . .

UC:          lol does he want to meet at the gas station at five mile and ustick? I

             can walk there

JESS:        That should be fine. He's about 15-20 minutes from there, finishing

             up at the office.

UC:          k do you want to give him my number?

JESS:        Sure. I'll tell him he's meeting you to pick up something for the kids

             for Christmas.

UC:          ok

JESS:        What do you think you'll do? What do you WANT to do?

UC:          idk [I don't know] probly let him tel me

JESS:        Don't be afraid to be direct about what you want ;)

UC:          ok..whats his name?

JESS:        Ooh, when you get to your place, you could run to your room and say

             you'll be right back, then come back out naked or in a robe or

             something!

| JESS: | Joshua |
|---|---|
| UC: | lol ok |
| | . . . . . . . . . . . . . . . . . . . . |
| JESS: | I gave him your name and number. He said he'll text as he's leaving the office |
| UC: | ok…how long u think so i can get ready |
| JESS: | Maybe 15-20 minutes. His office is on the Bench |
| UC: | ok |
| JESS: | Any word from him yet? |
| UC: | ya…but can i just tell him? i don't want him to be mad |
| JESS: | About your age? |
| UC: | ya |
| UC: | i just don't want him mad tbh |
| JESS: | You do whatever you feel you need to. I don't want you to be uncomfortable in the slightest. |
| UC: | ok |
| JESS: | He DEFINITELY won't be mad, I promise that. |
| JESS: | You are too cute :) |
| JESS: | I told him how old you are. I don't want you to feel weird. I think you're good… ;) |
| UC: | ya he seems cool ty |
| JESS: | Of course! Have fun! Let me know how it goes! |

. . . . . . . . . . . . . . . . . . . .

Beginning at 1:30 a.m. on November 24, 2019, and ending at 2:18 a.m. on November 24, 2019, the following text message exchange between Drake posing as a fictitious husband named "Joshua" and the UC occurred:

JOSHUA:     Hi, is this Katie?

JOSHUA:     Sorry, Kaylee*

UC:         whos this?

JOSHUA:     My name is Joshua

UC:         oh hey

JOSHUA:     My wife said she bought a Christmas gift from you on Facebook?

UC:         lol ok

UC:         how long till u get here?

JOSHUA:     5mile and Ustick?

UC:         ya

UC:         ur wife is a cool chick

JOSHUA:     10, 15 minutes. The roads are empty

. . . . . . . . . . . . . . . . . . . .

UC:         hey i have to be honest with u…ur wife set us up to meet. i just don't want u to be mad

UC:         yes

JOSHUA:     Cool.

UC:         she said you would be cool with me being younger

JOSHUA:      That's fine. She gets stuff on Facebook all the time.

JOSHUA:      I don't see that being a problem.

UC:          no like a hookup meet

JOSHUA:      Oh!

JOSHUA:      Oooohhh…

JOSHUA:      Well… I'm okay if you're okay, I guess?

JOSHUA:      I mean, my hands are shaking like crazy all of a sudden and my mouth

             has gone dry, but I don't think that's a bad sign.

UC:          so r we good…she told u how old i am? i just don't want drama

JOSHUA:      And I am at the station getting gas now.

JOSHUA:      She just told me, yeah.

UC:          cool…do u just wanna come to my house?

JOHSUA:      You know, I won't lie: I do have a bit of a younger girl thing… so I

             have no problem if you have no problem.

JOSHUA:      YES.

                  . . . . . . . . . . . . . . . . . . . .

The UC then subsequently directed Drake to the address of a residence and asked
him to enter through the back door so the neighbors wouldn't see him. Dkt. 30-2, at 3. Law
enforcement observed Drake travel from the gas station at the corner of Ustick and Five
Mile to the address of the residence provided by the UC. Drake exited his vehicle and went
to the door at the rear of the residence. Law enforcement officers then encountered Drake
and took him into custody. After he was advised of his Miranda rights, Drake indicated

that he would speak with law enforcement. Drake was then transported to the Idaho State Police Office for an interview with Special Agent Thomas Sallaway.

During the interview, Drake talked about the life struggles he had recently encountered, including problems with his marriage, finances, family, employment, and anxiety and depression. Drake stated that such struggles led him to turn to the Doublelist website to meet women. Drake said he had previously engaged in sexual contact with an adult female he had met on Doublelist. Drake also confirmed that he was the person utilizing both the "Jess" and the "Joshua" personas to communicate with the person who told him she was fifteen.

Drake acknowledged that the text exchange made it seem like he intended to have sex with a fifteen-year old girl. However, he also said that he did not believe that the person with whom he was communicating was really fifteen, and that he believed "Kaylee Jo" was simply role playing. Dkt. 30, at 11; Dkt. 32-1, at 1. Drake said he was not sure if he would have gone through with sexual contact if "Kaylee Jo" had really been fifteen. Dkt. 30, at 11. He also stated he felt, "a little entrapped from the start." Dkt. 36, at 3. Eventually, law enforcement asked Drake to submit to a polygraph examination. Following the examination, Drake invoked his right to remain silent by requesting a lawyer. Law enforcement arrested Drake and later charged him as detailed above.

On July 30, 2020, Drake filed a Motion to Dismiss both counts of the Indictment for failing to set forth a sufficient basis for the charges against him. Dkt. 27. On August 7, 2020, the Government filed a Motion in Limine to preclude Drake from using the entrapment defense in any way at trial. Dkt. 30. Finally, on August 14, 2020, Drake filed

his First Motion in Limine to preclude the Government from allowing the jury to hear any evidence that Drake took a polygraph test and the results of the test, as well as any evidence that he invoked his right to an attorney on November 24, 2019. Dkt. 32. The motions have been fully briefed and are now ripe for the Court's review.

## III. ANALYSIS

Because the Court's decision on the Motion to Dismiss Indictment will determine whether or not there is a trial, and thus whether the Motions in Limine must be considered, the Court first addresses the Motion to Dismiss Indictment.

### A. Motion to Dismiss Indictment (Dkt. 27)

#### 1. Legal Standard

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), a defendant may bring a motion challenging the sufficiency of the indictment. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it: (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend"; and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). The failure of an indictment to recite an essential element of a charged offense is a "fatal flaw requiring dismissal of the indictment." *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999).

"[A]n indictment 'should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied.'" *United States v.*

*Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007) (quoting *United States v. King*, 200 F.3d 1207, 1217 (9th Cir. 1999)). In cases where an indictment "'tracks the words of the statute charging the offense,' the indictment will be held sufficient 'so long as the words unambiguously set forth all elements necessary to constitute the offense.'" *United States v. Davis*, 336 F.3d 920, 922 (9th Cir. 2003) (quoting *United States v. Fitzgerald*, 882 F.2d 397, 399 (9th Cir. 1989)). In reviewing a motion to dismiss an indictment under Rule 12(b)(3)(B), a court must accept the facts alleged in the indictment as true. *Winslow v. United States*, 216 F.2d 912, 913 (9th Cir. 1954).

   *2. Discussion*

   Drake concedes the allegations in the Indictment track the statutory language of his alleged crimes. Dkt. 27-1, at 3–4. However, Drake argues the Indictment is insufficient because it fails to provide essential facts that would allow him to prepare his defense of the case, to protect against double jeopardy, and to ensure that he is prosecuted on the facts presented to the grand jury. *Id*. at 2. For instance, Count One fails to identify the individual Drake purportedly attempted to "entice" and does not provide the specific application or website Drake allegedly utilized to do so. *Id*. at 3–4. Similarly, Count Two does not provide any information "regarding the person that Mr. Drake is alleged to have attempted to initiate the transmission of a name, address, telephone number, social security number, and electronic email address." *Id*. at 5. Given the Indictment's failure to provide information regarding the specific minor and the means used to entice such minor, Drake argues the Indictment is insufficient to allow him to plead jeopardy should he later be prosecuted—

for example—for similar conduct with a different individual that could have taken place during the time frame at issue in Counts One and Two.

The Government counters that the Indictment is sufficient because it sets forth all of the essential elements of the crimes charged, because it includes additional factual information such as the dates the alleged offense took place ("on or between November 23 and November 24, 2019") and the means of interstate commerce ("the internet") used to commit the offense, and because the discovery the Government has provided to Drake establishes, in specific detail, what the Government's factual allegations are and what evidence the Government will use at trial. Dkt. 28, at 1–2; Dkt. 17. As such, the Government contends the Indictment states sufficient facts to enable Drake to defend his case and to protect him against double jeopardy. The Court must agree.

In the Ninth Circuit, the "use of a 'bare bones' information—that is one employing the statutory language alone—is quite common and entirely permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime to be punished." *United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995) (quoting *United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987)). As such, the Ninth Circuit in *Woodruff* held an indictment charging violation of the Hobbs Act was sufficient even though it contained no factual allegations to establish the obstruction or interference with interstate commerce.[8] *Id.* at 676. The indictment at issue in *Woodruff* alleged that the defendant "did

---

[8] The Hobbs Act provides for criminal punishment for anyone who "obstructs, delays or affects commerce of the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property, in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951(a).

obstruct, delay and affect commerce by the attempted robbery" of several jewelry stores in California, but did not expressly allege any fact to establish *how* the defendant obstructed or interfered with interstate commerce. *Id*. at 675–76. The district court dismissed the indictment, holding: "To defend himself, defendant is entitled to be told the theory upon which the government predicates its allegation that defendant caused [an] impact on interstate commerce. The government has simply not so informed defendant." *Id*. at 676.

The Ninth Circuit reversed the dismissal, noting that the indictment sufficiently informed the accused of the specific offenses with which he was charged, and that the though the government would need to prove the "interstate impact" of the robberies at trial, it was not required to identify such impact in the indictment. *Id*. at 677. Here, the Indictment similarly informed Drake of the specific offenses for which he was charged, the date of such offenses, and the specific means of interstate commerce used to accomplish the offenses. While, at trial, the Government will have to present facts to show how Drake attempted to entice an individual who he believed was a minor, identify the specific individual, and also prove that such enticement occurred, it was not required to plead such "evidentiary detail" in the Indictment. *Woodruff*, 50 F.3d at 676 (quoting *Carbo v. United States*, 314 F.2d 718, 733 (9th Cir. 1963)).

In *United States v. Rosi*, 27 F.3d 409, 411 (9th Cir. 1994), the Ninth Circuit similarly upheld a "bare-bones" indictment alleging that "on or about January 22, 1992, in the District of Arizona," Rosi "did transport in interstate or foreign commerce money of a value in excess of $5,000, knowing said money to have been stolen." *Id*. at 414. Rosi argued the indictment was insufficient because, in failing to identify the specific states (Arizona

and California) at issue, there was no guarantee that he could not subsequently be prosecuted for transporting stolen money between other states during the relevant time frame. As such, like Drake, Rosi contended that he had no guarantee that he was prosecuted on the facts presented to the grand jury—one of the central purposes that an indictment serves. *Id*. at 415. Unlike Drake, however, Rosi even presented evidence (rather than a theoretical possibility) that there were at least two other states between which he had transferred money during the time frame at issue—Hawaii and Colorado—upon which the grand jury could have based its charge. *Id*. Despite the ambiguity in the indictment, the Ninth Circuit held that although it was not a model of sufficiency, the indictment nevertheless satisfied the minimal constitutional standard of informing Rosi of the nature of the crime charged and setting forth the elements of such crime. *Id*. (first citing *United States v. Haas*, 583 F.2d 216, 219 (5th Cir. 1978); and then citing *United States v. Conlon*, 628 F.2d 150, 156 (D.C. Cir. 1980)).

Here, although Drake may have attempted to entice unidentified minors other than "Kaylee Jo" on or between November 23 and November 24, 2019, the Indictment sufficiently informed Drake of the nature and elements of the crimes charged. Moreover, Drake does not identify any authority to suggest an indictment must include the name of the minor or the specific internet application used in an enticement of a minor prosecution. In fact, the Government is statutorily prohibited from including a minor victim's name in any public document, including an indictment. 18 U.S.C. § 3509(d)(2). As such, in cases involving child victims, the Government routinely identifies a minor child in the indictment

as "Jane Doe" or  the "Minor Victim." Dkt. 28, at 6.[9] If the Court accepted Drake's

argument that the Indictment is insufficient because it does not specifically identify the

alleged minor victim, any indictment charging enticement of a minor while also complying

with 18 U.S.C. § 2509(d)(2) would be insufficient. Further, in cases where, as here, an

undercover officer is involved, the Government also has a legitimate reason for keeping

the identity of the officer classified, as undercover detectives often use the same undercover

persona in multiple investigations. Dkt. 28, at 6 n.1.

In his Reply in Support of the Motion to Dismiss, Drake analogizes this case to

*United States v. Coronado*, 2005 WL 8168060 (D. Ariz. July 14, 2005), (adopted by the

district court in *United States v. Coronado*, 2005 WL 8168059 (D. Ariz. Sept. 12, 2005)),

where defendants were charged, *inter alia*, with interfering with one or more U.S. Forest

Service officers in violation of 36 C.F.R. § 261.3. Dkt. 31, at 3–6 (citing *Coronado*, 2005

WL 8168060). The *Coronado* court determined that although it tracked the regulatory

language, the indictment was insufficient because it did not identify *how* the defendants

interfered with U.S. Forest Service officers. While the indictment stated that the offense

conduct occurred in the Sabino Canyon Recreation Area on or about March 24, 2004, the

defendants were engaged in a wide variety of activities that could fall within that temporal

and spatial confine, which could also potentially be considered as "interfering with one or

more U.S. Forest Service officers." *Id.* at *4. For instance, at the aforementioned time and

place, defendants protested a mountain lion hunt ordered by the U.S. Forest Service in a

---

[9] Any indictment that contains the name of a minor child has to be filed under seal and a redacted copy
filed in the public record. *Id.*

**MEMORANDUM DECISION AND ORDER - 19**

number of ways. Defendants, or some of them, "trespassed, took videotapes, denounced the hunt on tape, lay down mountain lion urine, set up surveillance, dug up snares and sensors, [and] fled and hid from the agents." *Id*. Because there was "such a large range of possible offense conduct" at issue, the *Coronado* court held that the government's failure to further specify the facts and circumstances of the offense denied the defendants fair notice as to what they had done to violate the regulation. Accordingly, the indictment did not provide sufficient information for the defendants to properly prepare their defense and was dismissed. *Id*.

Drake suggests the circumstances in this case are similar to those in *Coronado* because a wide range of conduct could constitute utilizing the internet on November 23 and 24, 2019, including "cellular phone calls, responding to Craigslist ads, various computer searches, email, video gaming, chat rooms, streaming services, bill paying apps, having a call with one's grandmother, texting dozens of acquaintances, etc." Dkt. 31, at 5. Drake contends the variety of activities that could fall within the spatial confine of "the internet" is "significantly more nebulous and widespread than the spatial and temporal confine found insufficient by the *Coronado* Court." *Id*. at 6. This argument ignores that none of the innocuous activities Drake identifies would also constitute using the internet to "*knowingly persuade, induce, entice and coerce a person . . . believed to be a minor to engage in sexual activity* for which any person can be charged with a criminal defense," as Count One alleges. Dkt. 17, at 1 (emphasis added). Nor would any of the aforementioned innocent conduct involve attempting to initiate the transmission of personal information from an individual under the age of 16 "*with the intent to entice, encourage, offer, and*

*solicit any person to engage in sexual activity*," as alleged in Count Two. *Id.* at 2 (emphasis

added). Unlike in *Coronado*, where defendants had taken a number of actions which may—

or may not—have violated the regulation at issue, here only the illegal act of enticing a

minor over the internet for the purpose of sexual activity is at issue. No other internet

communications are involved. As such, identification of the specific dates and technology

used during the charged offenses, as well as the elements of the relevant statutes,

reasonably apprised Drake of the nature and elements of the crimes charged.

Finally, through discovery, the Government has also specifically identified the

person with whom the Government alleges Drake communicated (the UC), the specific

name (Kaylee Joe) and age (15) of the UC's minor persona, the specific internet application

through which Drake came into contract with the UC (Doublelist), and the specific emails

and text messages which support Drake's charges. Dkt. 28, at 6 n. 2. From the Indictment

and the discovery Drake received, he "learned enough of the charges against him to prepare

for trial, to avoid surprise at trial, and to plead double jeopardy in the event of a new

prosecution." *United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979). Under such

circumstances, denial of the Motion to Dismiss Indictment is appropriate.[10] *Id.* at 1177–81.

In sum, because an "indictment which tracks the words of the statute charging the

offense is sufficient so long as the words unambiguously set forth all elements necessary

to constitute the offense," and because Drake concedes the Indictment tracks the words of

---

[10] Although, as Drake notes, sufficient discovery would not alone be sufficient to salvage an invalid indictment, here the Court finds the Indictment was sufficient to notify Drake of the circumstances and elements of the crimes charged and the discovery provided by the Government further supports this conclusion. Dkt. 31, at 6.

the statute and does not dispute that the Indictment sets forth all of the necessary elements of the crimes charged, the Court finds the Indictment is sufficient. *United States v. Givens*, 767 F.2d 574, 584 (9th Cir. 1985).

### B.  Motion in Limine to Exclude Entrapment Defense (Dkt. 30)

The Government's Motion in Limine seeks an order prohibiting Drake from introducing any evidence or argument regarding entrapment during trial and requests that the Court decline to provide an entrapment jury instruction.

#### 1.  Legal Standard

"Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Miller v. Lemhi Cty.*, 2018 WL 1144970, at *1 (D. Idaho Mar. 2, 2018) (quoting *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). "The term 'in limine' means 'at the outset.' A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).

Because "[a]n in limine order precluding the admission of evidence or testimony is an evidentiary ruling," *United States v. Komisaruk*, 885 F.2d 490, 493 (9th Cir. 1989), a district court has discretion in ruling on a motion in limine. *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, in limine rulings are preliminary and, therefore, "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

A pretrial motion is an appropriate means of testing the sufficiency of a proffered defense and precluding evidence of such defense if the defense is found to be legally insufficient. Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."); *see also United States v. Peltier*, 693 F.2d 96, 98 (9th Cir. 1982) (affirming district court's pretrial order excluding duress defense where defendant's evidence did not satisfy each of the elements of a prima facie case for a defense of duress prior to trial).

A defendant is entitled to an instruction for a defense "for which there exists evidence sufficient for a reasonable jury to find in his favor." *United States v. Spentz*, 653 F.3d 815, 818 (9th Cir. 2011) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). "Only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *Id.* (quoting *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir. 1993)). However, a court may exclude evidence of a defense where there is not at least some evidence to support each element of a specific defense. *Peltier*, 693 F.2d at 98.

### 2. Discussion

Entrapment is a "relatively limited defense," *United States v. Russell*, 411 U.S. 423, 435 (1973), with two elements: (1) the defendant was induced to commit the crime by a government agent; and (2) the defendant was not otherwise predisposed to commit the crime. *Spentz*, 653 F.3d at 818 (holding that a defendant is not entitled to have the issue of entrapment submitted to the jury in the absence of evidence showing both of the aforementioned elements) (first quoting *United States v. Rhodes*, 713 F.2d 463, 467 (9th

Cir. 1983); and then citing *United States v. Busby*, 780 F.2d 804, 806 (9th Cir. 1986) ("The trial court will instruct on entrapment only if the defendant presents some evidence of both elements of the entrapment defense.")).

While inducement and predisposition are treated as separate inquiries, the "two are obviously related: If a defendant is predisposed to commit the offense, he will require little or no inducement to do so; conversely, if the government must work hard to induce a defendant to commit the offense, it is far less likely that he was predisposed." *United States v. Poehlman*, 217 F.3d 692, 698 (9th Cir. 2000) (citation omitted). "The 'measure of sufficiency' of a defendant's prima facie showing is 'whether the evidence of inducement and lack of predisposition, considered together' and viewed in the light most favorable to the defendant, 'is sufficient to permit a reasonable jury to find entrapment.'" *United States v. Cawthon*, 637 F. App'x 804, 805 (5th Cir. 2016) (quoting *United States v. Theagene*, 565 F.3d 911, 918 (5th Cir.2009)).

"To raise entrapment, defendant need only point to evidence from which a rational jury could find that he was induced to commit the crime but was not otherwise predisposed to do so." *Poehlman*, 217 F.3d at 698. Further, the defendant "need not present the evidence himself; he can point to such evidence in the government's case-in-chief, or extract it from cross-examination of the government's witnesses. The burden then shifts to the government to prove beyond a reasonable doubt that defendant was *not* entrapped." *Id.* (emphasis in original). If sufficient evidence of entrapment is presented, a jury instruction must be given even if the entrapment defense is inconsistent with other offered defenses. *Mathews*, 485 U.S. at 63.

In its Motion in Limine, the Government argues that Drake cannot show he was either induced to commit the alleged offenses by the UC, or that he was not otherwise predisposed to committing the alleged offenses. Drake counters that the Government's Motion in Limine is premature and improper, and that the Court should only determine whether an entrapment instruction is appropriate *after* the parties present their evidence at trial.

a.   Inducement by the UC

Inducement is the "conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer." *Sorrells v. United States*, 287 U.S. 435, 448 (1932). "Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *Poehlman*, 217 F.3d at 698. However, an improper inducement goes "beyond providing an ordinary 'opportunity to commit a crime.' An 'inducement' consists of an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Gendron,* 18 F.3d 955, 961 (1st Cir. 1994) (quoting *Jacobson v. United States*, 503 U.S. 540, 548 (1992)).

The Government suggests Drake cannot make a prima facie showing of inducement because the UC never attempted to persuade, threaten, coerce, or otherwise trick Drake into committing the alleged crimes. Dkt. 30, at 15–16. In fact, the communications between

the UC and Drake show the UC repeatedly gave Drake opportunities to walk away from the situation. The very first statement the UC made to Drake was "your hubby like younger girls? Lol." Dkt. 30, at 3. Drake responded, "I don't think he'd have a problem with a younger girl 😉 The real question is HOW young. I don't really want to set him up for statutory rape..." *Id.* The UC then gave Drake his first chance to walk away, stating "hmmm. . . im probably too young then lol." *Id.* Despite the UC's indication that she was too young to provide legal consent, Drake responded, "not necessarily 😉 As long as you're consenting and safe I don't think age matters too much." *Id.* Once the UC told Drake she was fifteen, Drake again did not leave the conversation, but instead repeatedly conveyed that he was into younger girls, making statements like "he does have a bit of a schoolgirl fantasy, so you're kind of perfect" (Dkt. 30-1, at 2) and "[y]ou know, I won't lie: I do have a bit of a younger girl thing. . . so I have no problem if you have no problem." Dkt. 30-2, at 2. The UC ultimately asked Drake seven times during the conversation if her age would be an issue. *See generally* Dkts. 30-1, 30-2. Each time, Drake reassured the UC that he had no issue with the age difference and was interested in meeting for sex. *Id.*

Drake counters that the Government initiated contact with him, and that the UC responded to an ad Drake placed on a website for consenting adults who must confirm that they are 18 years of age or older. Dkt. 36, at 2. In addition, although Drake instigated the sexual messages, and repeatedly indicated he was interested in meeting the UC for sex, it was the UC who first texted, "so how would we do this?" Dkt. 30-1, at 3. Drake proposed meeting sometime during the week, but the UC replied that her parents were out of town

that night and would be back the next day. *Id*. at 4. When Drake questioned if she would like to meet in a public place first, the UC suggested meeting that night at the gas station near her house. *Id*. After exchanging pictures and text messages for another thirty minutes, the UC again raised the issue of meeting that night, asking, "so you still thinking tonight..?" *Id*. at 5. Drake again offered to meet in a public place later that week (albeit to have sex in a dressing room at some place like the mall) but the UC responded: "The mall is closed right?" *Id*. Drake confirmed that the mall was closed but that he "figured if tonight didn't work for you that might be an option tomorrow or something." *Id*. at 6. The UC responded "my parents will be home tomorrow so…" *Id*. Drake suggests that the UC's repeated suggestion that time was of the essence is evidence that he was induced by the UC.

The Ninth Circuit has defined inducement as "*anything* that materially alters the balance of risks and rewards bearing on defendant's decision whether to commit the offense, so as to increase the likelihood that he will engage in the particular criminal conduct." *Poehlman*, 217 F.3d at 698 (emphasis added). Inducement "can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense," which, in addition to threats, can also include, *inter alia*, "persuasion," "coercive tactics," and "promises of reward." *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994). While the Government argues that the UC "never pressured or coerced [Drake] in any way to communicate or meet with the 15-year old," the UC was the first to suggest a specific meeting time and place. Dkt. 30, at 15–16. It was also the UC who repeatedly implied that a meeting had to occur that night or may not occur at all since her parents were returning to town the next day. *See generally* Dkt. 30-1. A reasonable jury

could determine such tactics "promised a reward" or "persuaded" Drake to meet the UC immediately when he otherwise might not have followed through with a meeting. *See Poehlman*, 217 F.3d at 698 (noting all that is required of a defendant is to "point to evidence from which a rational jury could find he was induced to commit the crime[.]")

Because "even slight evidence of inducement is sufficient to allow a defendant to present an entrapment defense," the Court finds Drake has presented sufficient evidence of inducement to allow testimony regarding the entrapment defense at trial. *Davis*, 36 F.3d at 1431 (citing *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir. 1993)).

    b.  Predisposition

The predisposition element of the entrapment defense has been defined as a "defendant's inclination to engage in illegal activity for which he has been charged, *i.e.*, that he is ready and willing to commit the crime." *United States v. LaRizza*, 72 F.3d 775, 778 (9th Cir. 1995) (internal citation omitted). To establish predisposition, the prosecution must show that the defendant was disposed to commit a criminal act prior to being first approached by Government agents. *Jacobson*, 503 U.S. at 549; *see also Poehlman*, 217 F.3d at 703 ("[T]he relevant time frame for assessing a defendant's disposition comes before he has any contact with government agents, which is doubtless why it's called *pre*disposition." (emphasis in original)).

The Ninth Circuit has identified five factors for courts to examine when determining whether a defendant was predisposed to commit a crime: (1) the character or reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in activity for profit; (4) whether the

defendant showed any reluctance; and (5) the nature of the government's inducement. *United States v. Gurolla*, 333 F.3d 944, 955 (9th Cir. 2003). "Although none of these five factors controls, the most important is the defendant's reluctance to engage in criminal activity." *Davis*, 36 F.3d at 1430.

The Government argues the first factor is met here because, although Drake did not have any prior convictions related to sexual conduct with a minor (nor any criminal convictions at all),[11] Drake informed SA Salloway that he had turned to online sexual relationships in the past when feeling stressed or depressed. Dkt. 30, at 17. However, Drake also specifically stated that he had previously engaged in a sexual relationship with an adult female he had met on Doublelist. *Id*. The Supreme Court has expressly held that evidence "that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." *Jacobson*, 503 U.S. at 550. Drake's past consensual sexual relationship with an adult female, regardless of being casual and facilitated through the internet, was not illegal and is not evidence of predisposition to entice a minor for sex. *Id*. At present, there is no evidence in the record to suggest Drake's character or reputation supports a finding of predisposition.

The Government contends the next factor suggests predisposition because Drake was the first to suggest that the UC engage in illegal sex acts with him. Dkt. 30, at 18. Although, as the Government notes, Drake made it clear from the beginning of the

---

[11] Drake also notes that the Government seized his cell phone, tablet, and laptop computer after his arrest, and found "absolutely nothing suggesting a prior interest in sexual activity with minor children." Dkt. 26, at 7.

conversation that he was interested in meeting for sex, and although Drake (and not the UC) discussed specific sexual acts and engaged in sexually explicit conversation, it was also, as noted above, the UC who first suggested a specific meeting time and place. Dkt. 30-1, at 3. As Drake highlights, it was also the Government that used a website for consenting adults to suggest sexual activity with a minor child. Dkt. 36, at 6. The second factor does not weigh in favor of either party, as both played a part in suggesting criminal activity.

The parties agree the third factor (whether the defendant engaged in the activity for profit) is not relevant in this case. Dkt. 30, at 18; Dkt. 36, at 6. Because the Court has found Drake has provided some evidence to suggest inducement, the fifth factor weighs in his favor. The main dispute is with respect to the fourth factor, or whether Drake showed any reluctance. This "most important factor" is a close call. *See Davis*, 36 F.3d at 1430. On the one hand, as discussed above, Drake first suggested that he meet the UC in a public place, and repeatedly attempted to delay his encounter with the UC to a later date. On the other hand, the UC also gave Drake multiple opportunities to say he was uncomfortable with her age and to end the conversation. Despite such opportunities, Drake repeatedly reassured the UC that he liked younger girls and wanted to meet with her. Drake also traveled to meet with the UC for sex within hours of his first communication with her.

Other cases suggest Drake's quick acquiescence to an almost immediate meeting with the UC indicates his lack of reluctance to have sex with a minor. For instance, in *Jacobson*, the Supreme Court determined the defendant demonstrated a reluctance to commit the crime of receiving child pornography through the mail because he did not agree

to receive such materials until after the "Government had devoted 2 ½ years to convincing

him that he had or should have the right to engage in the very behavior proscribed by law."

503 U.S. at 553. Similarly, in *Poehlman*, the Ninth Circuit determined there was sufficient

evidence that the defendant was reluctant to cross state lines for the purpose of sex with a

minor because he did not do so until, among other things, after six months of a "prolonged

and steamy correspondence" with a UC. 217 F.3d at 703. By contrast, the Fifth Circuit held

a defendant *had* illustrated a lack of reluctance to have sex with a minor where, as here,

the defendant came into contact with a purported minor over the internet, and, within hours

of the initial contact, drove to a truck stop in the middle of the night to meet the minor for

sex. *Cawthon*, 637 F. App'x at 808. The *Cawthon* court affirmed the district court's refusal

to provide an entrapment instruction, finding the evidence demonstrated that "Cawthon

was an enthusiastic participant who promptly availed himself of the criminal opportunity,

precluding an entrapment instruction." *Id*. at 807 (cleaned up).[12]

Although the holding in *Cawthon* supports a finding that Drake was predisposed to

engage in sex with a minor, there is a significant distinction between the two cases. In

*Cawthon*, the defendant told officers in his post-arrest interview that he believed that the

girl with whom he had been conversing was fourteen and that he had planned to have sex

with her. *Cawthon*, 637 F. App'x at 805. "At no point during the interview did Cawthon

---

[12] The parenthetical "cleaned up," while perhaps unfamiliar to some, is being used with increasing frequency to indicate that brackets, ellipses, footnote reference numbers, internal quotation marks, alterations, and/or citations have been omitted from a quotation. For an example of its use in a published opinion, see *Lu v. United* States, 921 F.3d 850, 860 (9th Cir. 2019) or *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017). For a more thorough discussion regarding the practicality of the parenthetical, see Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143 (2017).

reverse course and profess to believe that 'Ashley' was anything but a fourteen-year old girl." *Id*. Here, Drake instead told officers that he did not believe "Kaylee Jo" was really a minor. Dkt. 30, at 11. Drake said he was not sure that he would have gone through with sexual contact if a fifteen-year old girl had greeted him. *Id*. Further, the defendant in *Cawthon* did not mention a supposedly mistaken belief as to the UC's age in support of his request for an entrapment instruction. By contrast, Drake has suggested his defense at trial will be that he believed he was meeting an adult female who was role-playing that she was fifteen for a consensual encounter. Dkt. 32-1, at 1. The Fifth Circuit's holding in *Cawthon* is not dispositive of the issue of predisposition because Drake has offered both evidence and argument that he believed he was meeting an adult who was role-playing as a minor, while the evidence in *Cawthon* instead contradicted such claim, and the defendant in *Cawthon* did not even make the argument that he believed the minor was really an adult during trial. 637 Fed. App'x at 805, 807.

Here, Drake has presented evidence that at least three of the Ninth Circuit predisposition factors could weigh in his favor. Although such evidence may not ultimately be presented at trial, the Court cannot find exclusion of all evidence regarding entrapment is appropriate under such circumstances. Generally, "the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused." *Davis*, 36 F.3d at 1430 (quoting *Sherman v. United States*, 356 U.S. 369 377 (1958)). Although entrapment is now "regularly litigated . . . before trial, on the government's motion in limine to preclude the defense," this practice "carries an increased risk that the court will be tempted to balance the defendant's evidence against the

government's invading the province of the jury." *United States v. Mayfield*, 771 F.3d 417, 440–41 (7th Cir. 2014). Thus, in ruling on a pretrial motion to exclude the entrapment defense, "the court must accept the defendant's proffered evidence as true and not weigh the government's evidence against it. This important point is sometimes obscured, subtly raising the bar for presenting entrapment evidence at trial." *Id*.

Because Drake has presented some evidence that the UC induced him to commit a crime that he was not predisposed to commit, the Court will not preclude Drake from presenting evidence or argument regarding the entrapment defense during trial. However, the Court will not determine whether Drake is entitled to an entrapment jury instruction until it has heard the evidence and argument at trial. The Government's Motion to Exclude Entrapment Defense is accordingly **DENIED**.[13]

### C. Drake's First Motion in Limine (Dkt. 32)

Drake seeks an order precluding the Government from introducing any evidence that it asked Drake to take a polygraph test and the results of that test. Dkt. 32, at 2. Drake also seeks to exclude any evidence that he invoked his right to an attorney during his

---

[13] In its Reply brief, the Government suggests that if the Court decides to wait until the close of trial to rule on the Government's motion, the Court should nonetheless preclude Drake from "arguing or mentioning entrapment in any way during voir dire, opening, or direct or cross-examination." Dkt. 38, at 4. The Government contends that until the evidence is submitted and the Court determines Drake has made the requisite showing, he should be prohibited from arguing or mentioning entrapment in any way during the trial because, if he is permitted to do so and the Court later rules that he is not entitled to the entrapment defense, the jury will have already heard argument on the issue and will be confused and the Government prejudiced. *Id*. However, the Court is not declining to rule on the Government's motion until after trial and has instead determined that Drake has made the requisite showing to present an entrapment defense at trial. Whether the evidence at trial will support an entrapment jury instruction is a separate issue the Court will address after it has heard the evidence.

interview with officers following his arrest. *Id*. The Government's Response states that it does not intend to introduce any evidence that Drake took a polygraph or the results of such test, and that it does not intend to introduce any evidence that Drake requested an attorney. Dkt. 34. Drake's First Motion in Limine is accordingly **MOOT** and is therefore **DENIED**.[14]

# IV.   ORDER

Now, therefore, IT IS HEREBY ORDERED:

1. Drake's Motion to Dismiss Indictment (Dkt. 27) is **DENIED**;

2. The Government's Motion to Exclude Entrapment Defense (Dkt. 30) is **DENIED**;

3. Drake's First Motion in Limine (Dkt. 32) is **MOOT** and is therefore **DENIED**.

DATED: October 2, 2020

David C. Nye
Chief U.S. District Court Judge

---

[14] Of course, should the Government change its mind and attempt to present evidence regarding the polygraph or Drake's invocation of his right to an attorney, Drake may renew his First Motion in Limine at trial.